UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | |
|---|---|
| JANE DOE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| VIRGINIA POLYTECHNIC INSTITUTE | ) |
| AND STATE UNIVERSITY, | ) |
| | ) |
| TIMOTHY SANDS, | ) |
| | ) |
| and | ) |
| | ) |
| KATHRYN POLIDORO, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No. _7:21cv00306_

## **COMPLAINT**

### **Introduction**

1.     Jane Doe[1], by counsel, files this action for compensatory, declaratory and injunctive relief to vindicate Plaintiff's civil rights.

### **Parties**

2.     Plaintiff Jane Doe is a United States citizen who resides and is domiciled in Prince William County, Virginia.

3.     Defendant Virginia Tech Polytechnic Institute and State University (hereafter "university" or "Virginia Tech") is an institution of higher education

---

[1] "Jane Doe" is not Plaintiff's real name. She is proceeding under a pseudonym for her privacy. Defendant will not be prejudiced by permitting her to proceed anonymously because it has knowledge of her actual identity.

located in the city of Blacksburg, Virginia, and is part of the statewide system of public higher education operated by the Commonwealth of Virginia.

4.      Defendant Timothy Sands is a United States citizen who resides in and is domiciled in Montgomery County, Virginia. At all times pertinent to this action, Dr. Sands acted in his official capacity as president at Virginia Tech.

5.      Defendant Kathryn Polidoro is a United States citizen who resides in and is domiciled in Montgomery County, Virginia. At all times pertinent to this action, Ms. Polidoro acted in her official capacity as a Title IX Coordinator / Director of Title IX Compliance at Virginia Tech.

6.      All of the actions of Virginia Tech's employees described herein took place under color of state authority.

## Jurisdiction and Venue

7.      This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

8.      Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 2201, 2202, 1331 and 1343.

9.      Venue is proper pursuant to 28 U.S.C. § 1391.

10.     Virginia Tech is a public university created under the Virginia Code, incorporated and with its principal place of business in this district.

11.     The errors and omissions giving rise to Plaintiff's claims took place in this district.

2

## Facts

### *Ms. Doe's Relationship with Ms. Conroy*

12.     In 2019, Ms. Doe enrolled as an undergraduate student at Virginia Tech to pursue a career in medicine.

13.     Ms. Doe enjoyed an outstanding academic reputation.

14.     During Ms. Doe's enrollment, she earned a 3.86 / 4.00 GPA while pursuing a Bachelor of Science in Human Nutrition, Foods and Exercise.

15.     On August 23, 2020, Ms. Doe met Maddy Conroy, another Virginia Tech student, and the two began a dating relationship.

16.     Ms. Doe had worked as a designated driver on campus.

17.     She met Ms. Conroy, while driving her home.

18.     During the conversation, Ms. Doe felt an attraction to Ms. Conroy, and Ms. Doe thought it was possible Ms. Conroy felt the same way.

19.     Ms. Conroy was not open about her sexuality.

20.     Until recently, Ms. Doe had not been open about her sexuality, either.

21.     The two exchanged phone numbers during the ride and discussed getting together for breakfast in the future.

22.     That night, Ms. Doe texted Ms. Conroy, and she replied, ""*ur the best. so glad u could b my therapist for the night lollll. but in all honesty, I would love to get to know u better and go out sometime*!!"

23.     The next day, Ms. Conroy sent Ms. Doe payment of $15 for the ride.

24.     Ms. Doe replied that she did not have to pay, since she was working as a designated driver, but thanked her for the gesture.

25.     Over the next two weeks, Ms. Doe and Ms. Conroy were inseparable.

26.     On August 23, 2020, Ms. Conroy texted Ms. Doe to meet for breakfast.

27.     On August 25, 2020, they messaged to go for a hike and decided they would get breakfast two days later.

28.     During the hike, Ms. Conroy and Ms. Doe talked the entire time. They took a picture together:



29.     On August 27, 2020, they went for a walk together, then had breakfast at Ms. Doe's apartment.

30.     That night, they went out for dessert at Cook-out, then drove around Blacksburg talking.

31.     On August 28, 2020, they went to the Blacksburg Farmer's Market. Ms. Doe bought Ms. Conroy a bouquet of flowers, which Ms. Conroy posted on her social media, "When she buys you flowers":



32.     They ate brunch together, and on the photo Ms. Doe posted of the

meal, wrote "First date kinda nervous":



33.     Over the next week, Ms. Doe and Ms. Conroy texted and spent time

together on an almost daily basis.

34.     Ms. Conroy told Ms. Doe that she did not like guys and that her prior romantic experiences with men were disappointing.

35.     On September 4-6, 2020, Ms. Conroy left for a weekend trip to Charlottesville. While gone, Ms. Doe texted Ms. Conroy to say not to worry about texting her while she was with her friends, to which Ms. Conroy responded, "I love texting you," added a red heart emoji, and wrote, "imy [I miss you].".

36.     On September 7-11, 2020, Ms. Doe and Ms. Conroy spent each day together one-on-one, discussed moving in together the following year, talked about taking trips to New York, went to Salem to get tested together for COVID, shared meals, and drove around Blacksburg.

37.     On September 11, 2020, Ms. Doe and Ms. Conroy went on a date to Red Robin. It was packed, so they went to the Cellar to have dinner. While out to dinner, Ms. Conroy's friend texted her and invited her to go out that night.

38.     Ms. Conroy invited Ms. Doe to join her out that night. They shared an Uber to her friend's apartment at 9:30 p.m.; walked to another friend's house; took a second Uber to a third friend's house; and, danced together.

39.     At the final destination, Ms. Conroy sat close to Ms. Doe on the couch. Ms. Doe began to stroke Ms. Conroy's leg, and Ms. Conroy was accepting of it. They decided to go back to their apartment complex. They shared an Uber with their friends and around 1:20 a.m. went to the first friend's house, then at 1:48 a.m. to their home.

40.     During the ride, they sat close to each in the backseat and cuddled. On arriving home, Ms. Conroy asked Ms. Doe to spend the night. Neither Ms. Conroy nor Ms. Doe were intoxicated. Each were able to walk up to the apartment. They went inside Ms. Conroy's apartment, talked briefly with her roommate, then went into her room together. Ms. Conroy changed out of her clothes, and they blew up an air mattress for Ms. Doe to "sleep in," which she took to be a cover for the roommate who was also in the apartment not to suspect what was happening.

41.     Ms. Conroy showered, then changed into other clothes.

42.     Ms. Doe sat on her bed. Ms. Conroy asked for her vitamins, which Ms. Doe gave to her.

43.     They laid down together in bed, with Ms. Conroy's arm stretched across Ms. Doe's body. They proceeded to cuddle / spoon in bed, then began to engage in sexual activity, wherein Ms. Doe rubbed Ms. Conroy's back and genitalia.

44.     Ms. Conroy never said no, stop, or voiced anything other than consent, through her actions.

45.     Ms. Conroy did briefly get up to lock her door, then returned to bed.

46.     The sexual activity lasted about two to three hours, then they both went to sleep.

47.     The next day, Ms. Doe woke up, still cuddling with Ms. Conroy and then soon after returned to her apartment. The two had planned to meet Ms. Doe's parents that night to celebrate her birthday.

48.     About 45 minutes after leaving, Ms. Conroy accused Ms. Doe via text of having taken advantage of her the night before.

49.     Ms. Doe was completely caught off guard and apologized. Ms. Conroy said she would not go to the birthday party.

50.     To this day, Ms. Doe does not know what transpired between Ms. Conroy and her roommate, after she left; if Ms. Conroy either felt regret about their relationship, or if her roommate said something that made her self-conscious.

51.     The fact that Ms. Doe was not yet open about her sexuality further complicated the entire situation. She had strong feelings for Ms. Conroy, and thought the feelings were reciprocated. She thought Ms. Conroy's feelings were genuine and Ms. Doe remains heartbroken and devastated by the situation.

### Ms. Conroy's Complaint Against Ms. Doe

52.     On September 18, 2020, Kristin Barnett, an investigator with the Virginia Tech Office of Equity and Accessibility, received a complaint from Ms. Conroy that Ms. Doe allegedly sexually assaulted her at an off-campus apartment on September 11-12, 2020, after a night out drinking.

53.     On September 24, 2020, Investigator Barnett sent Ms. Doe a notice of investigation alleging "potential violations of Gender-Based Violence as defined in the Student Code of Conduct against Madailein 'Maddy' Conroy."

54.     The notice alleged that:

      a.  During the evening of September 11, 2020, Ms. Conroy and Ms. Doe attended several parties together.

    b.  At the parties, both individuals consumed alcohol.

    c.  Ms. Doe encouraged Ms. Conroy to drink alcohol.

    d.  At the end of the night, Ms. Doe and Ms. Conroy returned to Ms. Conroy's apartment, where Ms. Conroy gave Ms. Doe an air mattress to sleep on in her bedroom.

    e.  While Ms. Doe was in Ms. Conroy's room, she got into Ms. Conroy's bed, under the covers, without consent, and proceeded to fondle Ms. Conroy's body, including rubbing areas of her vulva and inserting her fingers into Ms. Conroy's vagina.

55.    Investigator Barnett invited Ms. Doe to "schedule a meeting with you to discuss the matter and to go over processes and procedures."

56.    Ms. Doe provided a written statement refuting the allegations.

57.    Investigator Barnett proceeded to interview eight witnesses and gather social media evidence, text messages, and other documents, over the next several weeks to compile an investigative report with the full details of the complaint.

58.    Over the course of the investigation, Investigator Barnett added further details of on-campus activity that allegedly followed the night out.

59.    Investigator Barnett wrote in her report that after the alleged off-campus incident, Ms. Doe was "stalking" Ms. Conroy; that Ms. Doe "signed up for a study abroad program in Lugano, Switzerland, which any student may apply for, but it is intended for students in the Pamplin College of Business…. that she signed up after the investigation began…[Ms. Doe] was aware she was participating in this

program and only signed up for it after [Ms. Conroy] confronted her about the

alleged incident on September 11…Investigator acquired the activity log records of

[Ms. Doe]'s application from Virginia Tech's Global Education Office. That log

indicates [Ms. Doe] started her application to this program on September 13, 2020,

at 5:32 PM and finished her application on September 14 at 4:09 PM."

60.     Additionally, Investigator Barnett wrote that "[Ms. Doe] signed up to

be a coach for [Ms. Conroy's] sorority through a philanthropic event called Mock

Rock," a Virginia Tech school event, and "the sign-up sheet on google documents

went out between September 9 and September 13 and that [Ms. Doe] did pick [Ms.

Conroy's] sorority to be her first choice for coaching."

61.     Investigator Barnett interviewed Ms. Doe to respond to the claim that

she had stalked Ms. Conroy on campus, which she also denied.

### *Virginia Tech Student Conduct Policies* *and the New Title IX Rules*

62.     The adjudication of Ms. Conroy's charge against Ms. Doe was governed

by the Virginia Tech Student Code of Conduct (2020 edition) ("Code"), **Exhibit A.**

63.     Section II ("Student Rights and Responsibilities") of the Code set forth

various rights that applied to Ms. Doe as a student:

> a. "Students at Virginia Tech will be treated fairly and with dignity
>
>    regardless of…sexual orientation."
>
> b. "Students at Virginia Tech enjoy those rights guaranteed by the
>
>    Constitutions of the United States and the Commonwealth of
>
>    Virginia."

c. "The Student Code of Conduct and the policies and procedures it outlines…provides an administrative process for resolving allegations of misconduct…include[ing] certain procedural guarantees to ensure that students receive a fair and equitable resolution."

64. Section III ("Jurisdiction") of the Code stated that the disciplinary process applied to currently enrolled students (like Ms. Doe) as well as "students who are separated from the university for academic or disciplinary reasons" (enrollment status); students who violate the Code may be considered for discipline whether the action occurs on or off university property (location of incidents).

65. Section VII ("Student Conduct Process") of the Code outlined the procedural rights a student would receive to adjudicate a complaint:

a. An investigation to gather information about the complaint;

b. A formal hearing to determine whether the student violated policies in the Code of Conduct;

c. Written notice of the charges at least five days in advance;

d. To present witnesses/witness statements and question any witnesses present;

e. To share their version of events and refute any information.

66. However, in 2020, the Department of Education had passed a new set of laws strengthening the rights of accused students in cases involving sexual harassment or gender-based violence – which Ms. Conroy had alleged against Ms.

11

Doe. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020), avail. at: https://www.govinfo.gov/content/pkg/FR-2020-05-19/pdf/2020-10512.pdf.

67.    The new Title IX regulations stated that accused students now had the following rights among others under federal law:

    a.   To receive a copy of the final investigation report at least 10 days prior to the hearing;

    b.   To receive written notice of the date, time, location, participants, and policies charged, at least five days prior to the hearing;

    c.   To inspect and review during the hearing all evidence obtained during the investigation;

    d.   To present witnesses, including fact and expert witnesses;

    e.   To have their advisor conduct live cross-examination of the other party and any witnesses;

68.    The new Title IX regulations applied to all of a school's educational programs or activities, whether they occur on-campus or off-campus.

69.    In response to the Department of Education's new Title IX regulations, Virginia Tech sought to limit their application to students like Ms. Doe.

70.    Beginning in August 2020, Virginia Tech created a separate process for "Title IX cases" as opposed to Code of Conduct cases.

71.    Section VII ("Student Conduct Process") of the Code stated, "[f]ormal complaints of sexual harassment and/or gender-based violence should be reported to

the university's Title IX Coordinator….to determine whether a complaint falls within the scope of Title IX, as defined by the federal Department of Education, or under the policies in Virginia Tech's Student Code of Conduct."

72.     On August 13, 2020, Virginia Tech adopted "Policy on Harassment, Discrimination, and Sexual Assault (1025)", and said the new Title IX regulations strengthening the rights of accused would only apply to "on-campus incidents and off-campus incidents that cause continuing effects on campus," **Exhibit B.**

73.     In other words, Virginia Tech created a scheme to determine whether a student like Ms. Doe would receive the full panoply of rights under Title IX that the Department of Education had enacted the previous summer – or, if the complaint fell outside the "scope of Title IX" and therefore the student would receive only the basic procedural guarantees under the Code of Conduct.

74.     Virginia Tech tasked its Title IX Coordinator, Defendant Polidoro, with reviewing each complaint and determining what set of rules would apply.

75.     Ms. Doe's case involved a set of facts that fell within the scope of Title IX, i.e. an "off-campus incident[] that cause[d] continuing effects on campus."

76.     Therefore, Ms. Doe's case ought to have been adjudicated under the new Title IX regulations that were enacted the previous summer.

### *A Second Investigation Against Ms. Doe*

77.     During the course of Investigator Barnett's investigation, she opened a second case against Ms. Doe involving a claim from the previous year.

78.     On October 15, 2020, Investigator Barnett sent Ms. Doe a notice of investigation alleging "potential violations of Sexual Harassment and Sexual Assault – Rape & Fondling as defined in University Policy 1026 on Title IX Sexual Harassment" involving Elizabeth Rose Nesbit, her freshman year roommate.

79.     The notice alleged that:

a.  Ms. Nesbit and Ms. Doe were roommates at Payne Residence Hall during the prior academic year.

b.  Ms. Nesbit and Ms. Doe had a sexual relationship together.

c.  On January 20, 2020, Ms. Nesbit attended a party, wherein Ms. Nesbit consumed alcohol.

d.  Ms. Doe came to the party, then shared an Uber home with Ms. Nesbit, to their dorm.

e.  Upon arriving home, Ms. Nesbit did not feel well, needed assistance to her dorm, and had to lay down.

f.  Ms. Doe and Ms. Nesbit laid in bed together.

g.  While lying next to one another, Ms. Doe fondled Ms. Nesbit's breasts and penetrated her vagina with her fingers.

h.  Ms. Nesbit now denied that she had consented to the activity in bed that night, and filed a Title IX complaint with Virginia Tech.

80.     Ms. Conroy, in an effort to bolster her claim against Ms. Doe, had become associated with Ms. Nesbit, and Ms. Nesbit's claim followed shortly after Ms. Conroy's.

81.     Investigator Barnett advised Ms. Doe that an "investigation has been initiated to review these events"; "[a]t the conclusion of the investigation, if appropriate, the matter will be referred for a hearing, and a decision will be made to determine if you have violated University policy"; and, "you will have the right to review all materials prior to the conclusion of the investigation."

82.     On November 18, 2020, Investigator Barnett sent Ms. Doe an updated notice of investigation regarding Ms. Nesbit.

83.     The amended notice alleged that:

a.  While roommates, Ms. Doe exhibited unwanted behaviors toward Ms. Nesbit, including not allowing Ms. Nesbit to pay for her own items; not allowing Ms. Nesbit to spend time alone with their other roommates; buying Ms. Nesbit unwanted items; and checking on Ms. Nesbit's location.

b.  Ms. Nesbit claimed that Ms. Doe's behaviors served to isolate her from other people, and that Ms. Doe would sometimes yell at her.

84.     Investigator Barnett said that the allegations would be investigated in accordance with Virginia Tech's Title IX procedures.

### *Investigation Report, Failure to Apply Title IX Rules, and Formal Hearing*

85.     On November 18, 2020, Investigator Barnett finished her report into Ms. Conroy's allegations and forwarded it to Ms. Polidoro, her supervisor, for a final review, prior to referring the matter to the Office of Student Conduct.

86.     Upon reviewing the report, Ms. Polidoro decided that the Virginia Tech Code of Conduct procedures, not the new Title IX regulations, would be utilized in the adjudication of Ms. Conroy's case against Ms. Doe.

87.     When Ms. Polidoro failed to apply the new Title IX regulations to Ms. Doe's case involving Ms. Conroy, she violated federal law.

88.     Ms. Polidoro – as the Director of Title IX Compliance at Virginia Tech – ought to have been aware of the new Title IX regulations, when she failed to apply them in Ms. Doe's case even after they went into effect in May 2020.

89.     As a result of Ms. Polidoro's decision, Ms. Doe's case proceeded to a formal hearing under the wrong set of rules under federal law.

90.     As for Ms. Nesbit's allegations, Ms. Barnett never made a report for Ms. Nesbit's claims.

91.     Instead, Ms. Barnett put Ms. Nesbit's allegations into the final report for Ms. Conroy's case, as "related conduct," even though it occurred a year prior.

92.     Ms. Doe and her counsel, Joel Jackson, contacted Ms. Barnett to object and asked that the two matters be treated separately.

93.     Ms. Doe argued that she ought to be granted a separate hearing on Ms. Nesbit's allegations – which involved a separate time, place, and set of witnesses – to avoid the danger of prejudice and improper character evidence at the hearing.

94.     Plus, Virginia Tech had decided that Ms. Nesbit's claim was a "Title IX" matter, whereas Ms. Conroy's case was a "Code of Conduct" matter.

95.    Ms. Doe was referred to the Virginia Tech Office of Student Conduct to schedule a formal hearing for Ms. Conroy's case.

96.    Nothing further was done on Ms. Nesbit's case.

97.    On December 4, 2020, Ms. Doe met with Steve Schuh, Assistant Director of Student Conduct at Virginia Tech, who was assigned to go over the formal hearing process in Ms. Conroy's case.

98.    The formal hearing was scheduled for January 13, 2021.

99.    Mr. Schuh provided Ms. Doe a link to access Investigator Barnett's investigative report, including the various witness statements and documents.

100.    Mr. Schuh informed Ms. Doe that she was being charged with four counts: Sexual Violence – Rape; Sexual Violence – Sexual Battery; Sexual Violence – Sexual Assault; and Gender-Based Stalking.

101.    Virginia Tech assigned two members of the Office of Student Conduct, Ennis McCrery and Shanai Sloan, to adjudicate the charges at the hearing.

102.    Mr. Schuh told Ms. Doe that the formal hearing would only be about Ms. Conroy's allegations of assault and stalking, and that the other case involving Ms. Nesbit's unrelated claim would be on a separate date.

103.    Ms. Doe relied on Mr. Schuh's statement when he said the hearing scheduled for January 13, 2021, would only concern Ms. Conroy's allegations.

104.    Ms. Doe prepared to defend herself at the January 13, 2021 hearing to refute Ms. Conroy's claims, not Ms. Nesbit's.

105.    Ms. Doe appeared that day with counsel, Mr. Jackson.

106.    At the hearing, Ms. Doe learned that Investigator Barnett emailed her final investigative report in Ms. Conroy's case to Ms. Sloan and Ms. McCrery and failed to take out or redact any of the information about Ms. Nesbit's allegations.

107.    Then, mid-way through the hearing, Ms. Conroy called Ms. Nesbit as a witness.

108.    The hearing officers permitted Ms. Nesbit to start talking about her own unrelated allegations during the hearing on Ms. Conroy's case; the bell could not be un-rung.

109.    Rather than adjourn the hearing and reconvene with a different set of hearing officers who were untainted by the impermissible testimony, the hearing proceeded, and concluded that day.

110.    Neither Ms. Doe nor her counsel were permitted to directly cross-examine Ms. Conroy or any of her witnesses at the hearing, as would have been allowed had the university applied the new Title IX law.

111.    Had Ms. Doe or her counsel been permitted to cross-examine Ms. Conroy and her witnesses, she would have been able to establish the inconsistencies in Ms. Conroy's claim about September 11-12, 2020, and the week that followed, including that a) Ms. Doe and Ms. Conroy had engaged in a flirtatious, dating relationship in the weeks that led up to the night in question; b) that Ms. Conroy invited Ms. Doe to her apartment after the parties; c) that Ms. Conroy was not too intoxicated to consent; d) that Ms. Conroy had invited Ms. Doe to lay in her bed; e) that Ms. Conroy, through her words and actions, consented to sexual activity; and,

f) that Ms. Conroy perhaps awoke the next day confused about her sexuality, questioned her actions the night before, and lodged her complaint against Ms. Doe due to her conflicted feelings and in the face of peer pressure from friends who questioned whether she and Ms. Doe were in a same-sex relationship.

112.   On January 20, 2021, Ms. McCrery and Ms. Sloan sent Ms. Doe a letter with their decision in Ms. Conroy's case.

113.   Ms. McCrery and Ms. Sloan found Ms. Doe responsible for violating Virginia Tech's policies on rape and sexual battery, and not responsible for assault or stalking, and dismissed Ms. Doe from the university.

114.   Virginia Tech placed a notation on Ms. Doe's academic transcript that stated, "dismissed by university action."

115.   Ms. Doe appealed the student conduct decision, which was denied.

116.   Following the hearing on Ms. Conroy's case, Investigator Barnett never sent Ms. Doe an investigative report for Ms. Nesbit's complaint.

117.   Further, Virginia Tech never scheduled a formal hearing to adjudicate Ms. Nesbit's complaint.

118.   Instead, on March 2, 2021, Investigator Barnett wrote Ms. Doe to say that since she was dismissed from school in Ms. Conroy's case, "you are no longer subject to the Student Code of Conduct and [Office of Equity and Accessibility] must now dismiss your case because we no longer have jurisdiction."

119.   By failing to investigate, report, and schedule a hearing, Virginia Tech and Investigator Barnett violated Ms. Doe's rights under Title IX.

120.    Further, the Code plainly states Virginia Tech retains jurisdiction over "students who are separated from the university for academic or disciplinary reasons," and therefore to suggest Virginia Tech lost jurisdiction when Ms. Doe was expelled was wrong and directly contradictory to its own policies.

121.    Ms. Polidoro folded Ms. Nesbit's complaint into Ms. Conroy's case, thereby denying Ms. Doe any of the benefits of the new Title IX laws that would have helped her as an accused student in campus sexual assault cases.

122.    Virginia Tech's failure to prosecute Ms. Nesbit's complaint – despite clear directive that it had jurisdiction to do so – is evidence that it sought to avoid, minimize, and circumvent, the application of the Trump Administration's new Title IX laws balancing the rights of accused students with their accusers.

123.    Rather than fairly and equally apply the Title IX laws to a complaint that caused "continuing effects on campus" – in the case of Ms. Conroy – or took place "on campus" – in the case of Ms. Nesbit – Virginia Tech neglected to afford Ms. Doe a fair, just, and lawful process under the new Title IX procedures.

124.    The outcome of Ms. Doe's student conduct hearing must be set aside because it is a result of a flawed process that violated federal law.

125.    Prior to this incident, Ms. Doe was a confident, trusting, caring person, who dreamed of a successful career in medicine.

126.    But now, Ms. Doe has suffered an extreme disruption of her educational progress; a loss of reputation and good name; loss of future earnings;

mental and physical suffering; and, stress, emotional hurt, and humiliation. Ms. Doe has been severely and irreparably damaged.

127.    Ms. Doe now files this Complaint to seek compensation and injunctive relief for the violations of her federal civil rights, and to set aside the outcome of the student conduct hearing as violative of the Title IX federal law.

## COUNT I – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983

36.    Ms. Doe realleges the foregoing paragraphs.

37.    Ms. Doe had a protected property interest in her continued education at Virginia Tech, including the educational and training programs it supports.

38.    Ms. Doe accepted Virginia Tech's offer of admission in Spring 2019.

39.    Ms. Doe enrolled at Virginia Tech in Fall 2019.

40.    Thereafter, Ms. Doe paid the required fees for enrollment at Virginia Tech, for each academic year, 2019-2020, and 2020-2021.

41.    Ms. Doe remained in good academic standing as she pursued her degree at Virginia Tech during each year of her enrollment.

42.    Until the present case, Ms. Doe was compliant with Virginia Tech's conduct rules.

43.    Ms. Doe accepted Virginia Tech's offer of admission, paid the required fees for enrollment, complied with the conduct rules, and remained in good standing academically as she took coursework to pursue a degree.

44.     Ms. Doe was entitled to continue her education at Virginia Tech in accordance with its policies and procedures, unless Virginia Tech determined that she failed to meet its academic standards, failed to pay the required fees, or violated one of Virginia Tech's rules of conduct.

45.     Ms. Doe also had a constitutionally protected liberty interest in her good name, reputation and integrity.

46.     The due process provisions of the Fourteenth Amendment to the United States Constitution apply to the disciplinary process used by Virginia Tech against Ms. Doe.

47.     Ms. Doe was entitled to process commensurate with the seriousness of the charge of sexual assault and the discipline and sanctions she faced.

48.     The claim against Ms. Doe was very serious and resulted in harsh sanctions, as well as the prospect of a lifelong stigma that will foreclose future educational and work opportunities.

49.     Ms. Doe was entitled to fundamentally fair procedures to determine whether she was responsible for the alleged assault.

50.     Virginia Tech failed to provide adequate due process when it neglected to adjudicate Ms. Conroy and Ms. Nesbit's claims under separate hearings, to avoid the specter of bias, basing a decision on unrelated and irrelevant facts, and improper character evidence.

51.     The basic right to a hearing and an opportunity to be heard required separate hearings.

22

52.     As a result of the due process violations herein, Ms. Doe was wrongly disciplined and suffers ongoing harm to her good name and educational progress.

## COUNT II – VIOLATION OF TITLE IX

53.     Ms. Doe realleges the foregoing paragraphs.

54.     Title IX, 20 U.S.C. § 1681, *et seq.*, states, in pertinent part:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance."

45.     Virginia Tech constitutes an education program that receives federal financial assistance, including but not limited to millions of dollars in federal aid awarded to its students each year.

46.     Under Title IX, a school must "adopt and publish grievance procedures providing for prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder, including all forms of sexual harassment or sexual assault. *See* 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice).

47.     The procedures adopted by the school must "ensure the Title IX rights of the complainant" and "accord[] due process to both parties involved…" *See*, U.S. Dept. of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001), p. 22.

48.     Schools must implement procedures that, at a minimum, provide "adequate, reliable, and impartial investigation of complaints, *including the opportunity to present witnesses and other evidence.*" *Id.* at 20 (emphasis added).

49.     In 2020, the U.S. Department of Education promulgated a new set of regulations governing the adjudication of Title IX complaints that applied to Ms. Doe as a student at Virginia Tech, and carried the force of law.

50.     Virginia Tech, through its employees and agents, deprived Ms. Doe of her rights under the new Title IX regulations through its improper application and administration of its policies to Ms. Doe in its investigation and hearing.

51.     Further, Virginia Tech's decision to render the harshest available sanction against Ms. Doe – expulsion – is significantly harsher than comparably similar student conduct cases involving male students accused of sexual assault involving heterosexual activity at Virginia Tech, who were on average suspended, but not expelled. Virginia Tech's application of its policies in Ms. Doe's case and to expel her from the university discriminated against her on the basis of her gender.

52.     As a direct and proximate result of the above conduct – failing to follow federal Title IX law in adjudicating the claims, then applying the harshest possible penalty – Ms. Doe has sustained tremendous damage, including, without limitation, emotional distress, loss of educational opportunities, economic injuries, reputational damages, and other direct and consequential damages.

53.     As a result of the foregoing facts, Ms. Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## DEMAND FOR JUDGMENT

WHEREFORE, Ms. Doe requests the Court award the following relief, and enter a judgment against Virginia Tech:

a.     An award in the amount to be determined at trial in actual damages as compensation to Ms. Doe's reputation, and in compensation for the damage done to her mental, emotional, and physical health and well-being, plus punitive damages, prejudgment interest, attorneys' fees, expenses, and court costs;

b.     A declaratory judgment that Virginia Tech violated Ms. Doe's rights to due process and under Title IX;

c.     A permanent injunction requiring Virginia Tech, all other officers, employees, or agents of Virginia, and all other persons in active concert or participation with them, to expunge Ms. Doe's records at Virginia Tech of any indication of a finding that she committed an act of assault or was dismissed from the university, and further, to refrain from (i) continuing to enforce any sanction against Ms. Doe for alleged assault; (ii) making any notation in Ms. Doe's educational records related to the incidents described in this Complaint; and, (iii) making any disclosure

to a third party that any adverse disciplinary action was taken against

Ms. Doe arising out of the incidents described in this Complaint;

d.      An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 28

U.S.C. § 1920, and any other appropriate authority; and

e.      Any other further relief as the Court deems just and appropriate.

JURY TRIAL DEMANDED

May 17, 2021                              Respectfully submitted,

JANE DOE

By:  _____
                    Of Counsel

Robert E. Dean, Esq. (VSB No. 80288)
ROB DEAN LAW
401 Campbell Ave., Ste. 302
Roanoke, Virginia 24016
Phone:  (540) 585-1776
Fax:      (540) 301-0833
Email:  rob@robdeanlaw.com

*Counsel for Plaintiff*